UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| Columbus Life Insurance Company, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. _____ |
| | : | |
| Wells Fargo Bank, NA, as Securities Intermediary, | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

## COMPLAINT

Plaintiff, Columbus Life Insurance Company ("Columbus Life"), files and asserts this Complaint against Defendant, Wells Fargo Bank, NA, solely in its capacity as Securities Intermediary ("Wells Fargo"), and in support thereof, alleges and says:

## PARTIES

1. Columbus Life is an insurance company organized under the laws of Ohio with its principal place of business in Ohio.

2. Upon information and belief, Wells Fargo is a National Banking Association organized and existing under federal law with its main office located in South Dakota. Wells Fargo is a citizen of South Dakota for purposes of diversity jurisdiction. Wells Fargo is named as a party to this action solely because, as set forth below, in its capacity as Securities Intermediary, it holds bare legal title of the Policy (as defined herein).

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff, a citizen of Ohio, and the Defendant, a citizen of South Dakota, and because the amount in controversy exceeds $75,000.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Plaintiff's claims occurred in the Eastern District of North Carolina.

**FACTS COMMON TO ALL CLAIMS**

**The Policy Was Likely a Wager and Was Likely Owned and Controlled at the Outset by Investors Who Lack an Insurable Interest in Mrs. Laughinghouse's Life**

5. For hundreds of years, speculators have sought to use insurance to wager on the lives of strangers. *See, e.g.*, *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) (noting that life wagering has existed "[s]ince the initial creation of life insurance"); *Sun Life Assur. Co. v. Wells Fargo Bank, N.A.*, 238 N.J. 157, 164 (2019) (explaining that human life wagering has existed since at least 1419). Under the laws of most jurisdictions, including North Carolina, such wagering transactions are void *ab initio* and of no effect. *See e.g., Wharton v. Home Sec. Life Ins. Co.*, 173 S.E. 338, 339 (N.C. 1934).

6. Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

7. Making matters worse, in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only a limited number of seniors who had unwanted policies of sufficiently high value. As a result, promoters

sought to solve the supply side shortage by generating new, high value policies. These resulting life insurance policies came to be known as Stranger Originated Life Insurance ("STOLI") policies.

8. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured and paid for by third parties without an insurable interest in the insured.

9. In North Carolina and other places, not only do these STOLI policies violate insurable interest laws, but they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual protection to an insured's family, or others with an insurable interest in the insured, in the event an untimely death—into a cash machine whereby a stranger to the insured is actually more interested in seeing the insured dead than alive.

10. In the mid-2000s, Margarette Laughinghouse was in her late-seventies living in Pantego, North Carolina.

11. Upon information and belief, in or around late 2004 and early 2005, investors, by way of their agent Wesley Chesson—at the time an insurance producer at Hill, Chesson and Woody in Raleigh, North Carolina—likely used Ms. Laughinghouse to procure millions of dollars of life insurance—not for Ms. Laughinghouse or her family or for a legitimate insurance purpose—but rather for the investors themselves.

12. Upon information and belief, investors procured at least one life insurance policy on Ms. Laughinghouse's life, a $5 million dollar policy from Columbus Life (the "Policy").

13. Upon information and belief, the investors did not have an insurable interest in Ms. Laughinghouse's life and would not have been able to acquire the Policy had they not used Ms. Laughinghouse to generate it in the first instance.

14. Specifically, on November 20, 2004, the investors, by way of Mr. Chesson, submitted an application for life insurance to Columbus Life, purportedly executed by Ms. Laughinghouse in Pantego, North Carolina.

15. The application sought a $2.5 million policy with a $2.5 million rider, naming Ms. Laughinghouse as the initial owner and Ms. Laughinghouse's estate as the initial beneficiary.

16. The application also contained the representation that the proposed insurance would be used for "personal and family protection."

17. In reliance upon the representations contained in the application documents and other documents and information submitted to Columbus Life in connection with the application, Columbus Life issued a North Carolina policy, with number CM5014804U, on the life of Ms. Laughinghouse.

18. On February 16, 2005, Mr. Chesson transmitted a check in the amount of the Policy's first premium payment ($168,850.12) to Columbus Life. The check was drawn on the account of E&W, LLC ("E&W").

19. The Policy became effective on February 16, 2005, when the minimal initial premium was made.

20. Upon information and belief, E&W is a North Carolina limited liability company with a registered mailing address in Raleigh, North Carolina. The North Carolina Secretary of State identifies Mr. Chesson as the company's registered agent and manager. Neither E&W nor Mr. Chesson have an insurable interest in the life of the insured.

21. Upon information and belief, E&W paid this first premium amount as part of a non-recourse loan arrangement with Ms. Laughinghouse—i.e., Ms. Laughinghouse paid nothing for the Policy and incurred no obligation or risk in connection with the Policy; rather the Policy was financed by investors who had no insurable interest in the insured and who were gambling on her life.

22. On or around March 1, 2005, Columbus Life received written notification from the offices of Mr. Chesson that all rights, title, and interest in the Policy had been collaterally assigned by Ms. Laughinghouse to E&W effective February 16, 2005.

23. On or around February 6, 2007, Columbus Life received written notification from the offices of Mr. Chesson that E&W's collateral assignment was released effective February 8, 2007.

24. On or around April 13, 2007, Columbus Life received a written request to change the Policy's owner and beneficiary from Ms. Laughinghouse to CSSEL Bare Trust, care of "Wells Fargo Delaware Trust Company, as Trustee."

25. On or around January 26, 2011, Columbus Life received a written request to change the Policy's owner and beneficiary from CSSEL Bare Trust to "Wells Fargo Bank, NA, as Securities Intermediary."

26. On or around February 16, 2011, Columbus Life received a written notification from Credit Suisse that all rights, title, and interest in the Policy had been collaterally assigned by Wells Fargo to "Credit Suisse Securities (Europe) Limited" (a/k/a "CSSEL").

27. On or around July 20, 2015, Columbus Life received written notification that CSSEL's collateral assignment was released effective July 20, 2015.

28. On October 13, 2019, Ms. Laughinghouse passed away.

29. On information and belief, a claim for the Policy's death benefit was subsequently made by or on behalf of Wells Fargo.

30. Subsequently, Columbus Life discovered, on information and belief, that the Policy was procured by investors through a STOLI scheme and that, under North Carolina law, the Policy lacked an insurable interest prior to and at its inception and that the Policy was merely a wager on Ms. Laughinghouse's life.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT –
## ILLEGAL HUMAN LIFE WAGERING CONTRACT

31. Columbus Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

32. The Policy was applied for and executed in North Carolina by a North Carolina citizen, as owner. The Policy was then actually delivered to the owner in North Carolina. The Policy is governed by North Carolina law.

33. Under North Carolina law, where a person merely lends his or her life to a stranger to cloak what is in reality a wager on human life, that policy is void *ab initio*. *See, e.g., Wharton*, 173 S.E. at 339; *Slade v. Life & Cas. Ins. Co. of Tenn.*, 162 S.E. 734, 735 (N.C. 1932); *Allgood v. Wilmington Sav. & Trust Co.*, 88 S.E.2d 825, 830 (N.C. 1955).

34. Here, upon information and belief, stranger investors were wagering on Ms. Laughinghouse's life and hoping to trigger a secondary market cash-in on the Policy's $5 million death benefit.

35. Accordingly, Columbus Life seeks, and is entitled to, a declaratory judgment as to whether the Policy was an illegal wagering contract that violated North Carolina law, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

## SECOND CAUSE OF ACTION
## DECLARATORY JUDGMENT –
## <u>LACK OF INSURABLE INTEREST</u>

36. Columbus Life hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

37. Under North Carolina law, a policy not supported by an insurable interest at its inception is void *ab initio*. *See, e.g., Wharton*, 173 S.E. at 339; *Slade*, 162 S.E. at 735; *Allgood*, 88 S.E.2d at 830.

38. Only a policy procured in good faith by one with an insurable interest can later be assigned. *See Hardy v. Aetna Life Ins. Co.*, 67 S.E. 767, 768 (N.C. 1910).

39. As set forth above, upon information and belief, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Under such circumstances, the Policy is void *ab initio*.

40. Therefore, Columbus Life seeks, and is entitled to, a declaratory judgment as to whether the Policy lacked insurable interest because it was procured by and for the benefit of strangers without any insurable interest under North Carolina law.

Dated: March 3, 2020

By: *s/Tracy L. Eggleston*
Tracy L. Eggleston
Cozen O'Connor
301 South College Street, St. 2100
Charlotte, NC 28202
Telephone: (704) 348-3409
Facsimile: (704) 334-3351
Email: teggleston@cozen.com
N.C. State Bar No. 18471

*Attorney for Plaintiff Columbus Life Insurance Company*